**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 26-324-1** |
| | : | |
| **NYEEM ANDERSON** | : | |

# MEMORANDUM

**KENNEY, J.** **November 25, 2026**

On July 22, 2026, a federal grand jury returned an Indictment charging Defendant Nyeem Anderson ("Defendant") with (1) conspiracy to steal government funds, in violation of 18 U.S.C. § 371; (2) possession of stolen mail, in violation of 18 U.S.C. § 1708, on December 19, 2024; and (3) possession of stolen mail, in violation of 18 U.S.C. § 1708, on or about January 13, 2025, through May 26, 2026. *See* ECF No. 1.

Before the Court is Defendant's Motion to Suppress (the "Motion") (ECF No. 54), filed on October 14, 2026, in which he argues that the police officers' search of a closed shoe box during a vehicle "frisk" violated the Fourth Amendment of the United States Constitution. ECF No. 54 at 10. Accordingly, Defendant seeks to suppress the Treasury checks found during that search and all derivative evidence obtained as a result of that search. *Id.* at 14. The Government filed a Response in Opposition to the Motion on November 2, 2026 (ECF No. 56) and an Amended Response in Opposition to the Motion on November 6, 2026 (ECF No. 58). The Court held a hearing on the Motion on November 17, 2026. *See* ECF No. 59; Nov. 17, 2026 Hr'g Tr. ("Hr'g Tr."). Officers Marc Kusowski and Anthony Ramuno testified at the hearing. *Id.* Both officers' body camera footage documenting the vehicle stop and frisk were introduced into evidence (Gov't's Exs. A, B). The officers' Post-Incident Statement (Def.'s Ex. 1) and an excerpt of the Vehicle or Pedestrian Investigation Report (Def.'s Ex. 2) were also introduced into evidence.

For the reasons set forth below, the Court **DENIES** Defendant's Motion (ECF No. 54).

## I. FINDINGS OF FACT

1. On December 19, 2024, at approximately 8:20 P.M., Philadelphia Highway Patrol officers Marc Kusowski[1] and Anthony Ramuno observed a blue Hyundai Sonata (the "Sonata" or the "vehicle") with a broken front passenger side headlamp out and excessive tinting. ECF Nos. 54 at 7, 54-2 at 5; *see also* Hr'g Tr. at 12:17–13:2.
2. Officers Kusowski and Ramuno were both assigned to patrol duties in the 25th Police District. They were conducting routine patrol in a marked Ford Explorer police vehicle when they observed the Sonata. *Id.* at 10:24–11:14, 12:13–22, 54:18–22, 55:3–9.
3. Officer Kusowski has approximately sixteen years of law-enforcement experience, including about ten years in the 25th Police District. *Id.* at 8:9–12, 8:22–9:4.
4. Officer Ramuno has approximately eight years of experience, including six years in the 25th Police District. *Id.* at 52:18–20, 53:1–13.
5. Both officers testified credibly that the 25th Police District is a high-crime area. Both officers had participated in firearm arrests and investigations in the 25th Police District, including firearm recoveries during vehicle stops. *Id.* at 8:23–9:1, 10:2–3, 10:10–20 ("I was averaging about 60 gun arrests a year . . . that probably boils down to half pedestrian investigations, half vehicle investigations."), 53:19–23 ("I would describe the 25th District as a high crime district within the city of Philadelphia . . . I respond to shootings, homicides, robberies, stabbings."), 53:24–54:12, 55:12–18.

[1] The parties incorrectly spell Marc in their briefing as "Mark."

6. While the officers were traveling westbound on West Erie Avenue in Philadelphia, within the 25th Police District, the officers observed the Sonata traveling eastbound. *Id.* at 12:8–9, 12:15–22, 56:5–8.
7. Although it was dark outside given the time, the street appeared to be well lit based on the Court's review of the body camera footage. *See generally* Exs. A, B; *see also* Hr'g Tr. at 12:10–12, 56:2–4.
8. West Erie Avenue is a highly trafficked four-lane highway (two lanes each way). *Id.* at 12:1–9, 55:19–56:1.
9. The officers observed that the Sonata's front passenger head lamp was broken and that the windows of the vehicle had an excessive tint. *Id.* at 12:17–13:2, 56:7–15.
10. There is a factual dispute as to whether the back and front windshields had excessive tint. *Id.* at 36:5–37:1.
11. The Court finds that this dispute is immaterial to its findings because, regardless of whether the back and front windshields were tinted, the officers were in fact able to see into the vehicle based on the body camera footage and their consistent testimony.
12. Based upon the observed violations of the Pennsylvania Motor Vehicle Code, the officers made a U-Turn to position themselves behind the Sonata. *Id.* at 12:20–22, 56:7–15.
13. The Sonata and the police officers were stopped at a red light following the officers' U-Turn. *Id.* at 13:20–24.
14. After the light turned green, the officers activated their overhead lights and sirens. The vehicle did not immediately pull over. ECF No. 54-2 at 5; Hr'g Tr. at 14:2–6, 56:21–2.
15. Instead, the Sonata continued to slowly roll down the shoulder of West Erie Avenue for approximately fifty feet before stopping, despite having an opportunity to stop sooner.

Officer Kusowski identified this tactic to the Court as a "slow roll." *Id.* at 14:2–11, 56:21–57:2.

16. The term "slow roll" was used by Officer Kusowski in his testimony to describe the vehicle's movements after the police lights and sirens were activated. *Id.* at 12:2–9, 29:18–19 ("[T]hat not stopping, that slow roll to eventually come to a stop, not an immediate pullover.").

17. The Court acknowledges that there is a discrepancy between the post-incident statements, Exs. 1–2, which described the vehicle as travelling approximately 50 feet during the slow roll, and testimony that the vehicle moved 50–100 feet during the slow roll. Hr'g Tr. 37:2–13. The Court accepts the fact that the vehicle slow rolled down the block for approximately 50 feet. The Court observed the distance and time of the slow roll from the body camera footage and credits the post-incident statements. Exs. 1, 2.

18. Between the time when the officers activated their police lights and siren and the time when the vehicle stopped, both officers observed the front-seat passenger, later identified as Defendant, reach under his seat and throw a rectangular object into the back seat of the vehicle. The Court finds the officers' testimony credible because the testimony is consistent between both officers and is also consistent with the body camera footage entered into evidence as Exs. A and B. ECF No. 54-2 at 5; *see also* Ex. A at 20:20:20; Hr'g Tr. at 14:24–15:9 ("I can see the Defendant take something. He goes under his seat . . . He reaches under his seat, and he throws a dark rectangular object into the back seat over his left shoulder."), 17:13–18:16, 57:7–14 ("He was fumbling around at the floorboard in front of him, and then he threw a box in the backseat . . . which kind of raised concerns for

myself, thinking that, you know, is this guy reaching for a gun? And that's basically what I was thinking right away. Like, this guy's grabbing a gun or hiding a gun.").

19. The body camera footage recorded the officers commenting on Defendant's movements, including reaching under the seat and throwing an object towards the back seat of the vehicle. Ex. A at 20:20:22, 20:22:10, 20:23:15, Ex B. at 20:21:40.

20. Based on their experience, both officers believed that Defendant's conduct was consistent with either retrieving or concealing a firearm. Hr'g Tr. at 14:24–16:2 ("But when you're failing to stop like that, then I'm immediately becoming concerned that you may be armed."), 16:6–19 ("I wanted help because, again, I was—I was afraid he was armed."), 18:12–16 ("I was afraid he was either retrieving or concealing a firearm from underneath his seat."), 54:13–17 ("Some common areas would be under a seat, in the center console, in a glove box, in a bag that's in the back, in the back seat compartments."), 58:1–13 ("[Y]ou're just concerned that, you know, that they are armed illegally. And you're just, you're concerned for officer safety, for yourself, your partner."), 62:18–22 ("Again, from my experience, I've made a lot of arrests for firearms in this specific area. And my concern was that this guy was reaching for a gun.")

21. After observing this conduct, the officers called for a backup vehicle to pull in front of the Sonata. Ex. A at 20:20:31; Hr'g Tr. at 16:13–19, 21:21–22:4 ("I wanted at least another set of hands there to help me out, to give me whatever advantage I could have if I'm dealing with an armed individual."), 59:4–10.

22. After the backup vehicle pulled in front of the Sonata, Officer Kusowki approached the passenger side of the vehicle. Officer Kusowski immediately ordered Defendant out of the

vehicle, secured his hands and placed him in handcuffs. *See* Ex. A at 20:21:44, 20:21:54; *see also* Hr'g Tr. at 27:4–7.

23. Defendant was wearing a large winter coat. *See* Ex. A at 20:21:54.
24. Officer Kusowski then asked Defendant if he possessed a license to carry a firearm and if he was carrying a firearm. Defendant answered that he was not carrying a firearm. Defendant cooperated with Officer Kusowski throughout this encounter. *Id.* at 20:22:04, 20:22:06; *see also* Hr'g Tr. at 47:4–6.
25. Officer Kusowski frisked Defendant and then placed him handcuffed in the back of the police vehicle. Ex. A at 20:22:06, 20:22:52.
26. Defendant remained handcuffed while detained in the police vehicle. Hr'g Tr. at 27:12–25; Ex. A at 20:22:52.
27. At the same time, Officer Ramuno approached the driver of the vehicle, who was later identified as non-Party Malik Palmer. Ex. B at 20:22:08; *see also* ECF No. 54 at 7.
28. Officer Ramuno did not handcuff Mr. Palmer, but he did remove him to the back of the police vehicle. Ex. B at 20:22:40
29. Officer Ramuno told Mr. Palmer that he was being removed, and the frisk was taking place because of his and Defendant's conduct after the officers had activated their overhead light and siren. *Id.* at 20:22:10, 20:22:26. Once he brought Mr. Palmer to the police vehicle, Officer Ramuno told Mr. Palmer that they were going to frisk the Sonata for safety. *Id.* at 20:22:44.
30. At this point, neither Defendant nor Mr. Palmer were placed under arrest. Hr'g Tr. 27:17–28:9, 64:18–25.

31. Officer Kusowski returned to the Sonata after placing Defendant in the back of the police vehicle. He began searching the area underneath the front passenger seat where he had seen Defendant reaching. Ex. A at 20:23:17, 20:23:25.

32. Officer Kusowski identified to Officer Ramuno a brown Nike shoe box in the back seat as the item that he saw Defendant throw into the back seat. *Id.* at 20:23:19.

33. Officer Kusowski then examined, but did not open, a backpack which was located in the vehicle. He pressed the bag to identify whether it contained any hard objects which may have been a firearm. *Id.* at 20:23:35.

34. Officer Ramuno returned to the Sonata after placing Mr. Palmer in the back of the police vehicle. Ex. B. at 20:22:47.

35. Officer Ramuno first looked underneath the driver's seat. From the driver's seat, he reached for the Nike shoe box and brought it forward to the front seat. Ex. B at 20:23:19.

36. In doing so, Officer Ramuno removed the top of the shoe box, revealing that the box contained hundreds of U.S. Treasury checks in envelopes, which filled the entire shoe box. *Id.*; *see also* Hr'g Tr. at 66:23–67:2 ("I found hundreds of the Department of Treasury checks").

37. Based on the amount of paper in the shoe box, Officer Ramuno looked through the contents of the shoe box. Hr'g Tr. at 75:16–24 ("I suspected that the box may contain a firearm . . . it could have been under the paper or the checks.")

38. Officer Ramuno continued to look through the box upon revealing the checks and finding that there was no firearm in the shoe box. He noticed that the checks were written to numerous recipients. *Id.* at 66:25–67:2 ("Department of Treasury checks that were addressed to numerous persons and I believe maybe even businesses."), 73:10–23.

39. Officer Kusowski observed that the envelopes containing the checks were partially opened, exposing some of the recipients' names and the amount of each check. Both officers noticed that the checks were written to different recipients. *Id.* at 32:17–24 ("They were partially ripped open to, at the very least, show the denominations, the amount of the check."), 66:25–67:2; *see also* Ex. A at 20:24:29.

40. Both officers concluded that the checks were likely fraudulent, and they communicated this to the other officers on the scene. *Id.* at 20:24:52; *see* Ex. B at 20:23:39; Hr'g Tr. at 32:5–24 ("At that time, I thought they were either stolen checks or fraudulent checks"), 33:3–6, 33:16–24.

41. In turn, Philadelphia police officers made contact with Major Crimes and coordinated to identify the appropriate federal authorities for further investigation, including the U.S. Secret Service, Homeland Security Investigations, and the Postal Inspectors. ECF No. 54 at 8; ECF No. 58 at 4; *see also* Hr'g Tr. at 33:16–24.

42. Defendant was arrested for his possession of stolen Treasury/tax return checks, in reference to the checks identified in the shoe box. ECF No. 54 at 8; ECF No. 58 at 4–5.

43. The Court finds that Officer Kusowki is credible.

44. The Court finds that Anthony Ramuno is credible.

45. Both officers' testimony is corroborated by one another and by the body camera footage admitted into evidence.

46. To the extent that there are minor inconsistencies between the officers' testimony and contemporaneous statements made during or closely after the traffic stop, the Court will view those facts in the light most favorable to Defendant.

47. The Court finds that these inconsistencies do not undermine the credibility of the officers' testimony concerning their suspicion that Defendant was armed.

On July 22, 2026, a grand jury returned a seven-count Indictment against Defendant. ECF No. 1. Count Two of the Indictment charged Defendant with possessing United States mail containing Treasury checks on or about December 19, 2024, i.e., at the time of the traffic stop and Defendant's arrest. *Id.*; *see also* ECF No. 54 at 8. Defendant now alleges that the remaining Counts and conspiracy charges arose from the December 19, 2024 discovery of the stolen checks in the shoe box. *Id.* at 8,14. Defendant argues that the Government's warrantless search of the vehicle, including opening the shoe box, violated his Fourth Amendment rights. *Id.* at 9–12. In turn, Defendant argues that the evidence recovered during, and as a result of, the unlawful search must be suppressed. *Id.* at 14.

## II. <u>LEGAL STANDARD</u>

The Fourth Amendment of the United States Constitution protects against "unreasonable search and seizures." U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)). "Warrantless searches are presumptively unreasonable, 'subject only to a few specifically established and well-delineated exceptions.'" *United States v. Lackey*, No. 20-2977, 2022 WL 313807, at *2 (3d Cir. Feb. 2, 2022) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also Horton v. California*, 496 U.S. 128, 133 (1990).

When the Court is asked to examine a warrantless search, "the Government bears the burden" of proof to establish "that the disputed search falls within one of the recognized exceptions to the warrant requirement." *United States v. Perry*, 79 F. Supp. 3d 524, 529 (D.N.J. 2015) (citing

*United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992)). Indeed, "the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). "The Government must satisfy its burden of proof by a preponderance of the evidence." *United States v. Augustus*, 590 F. Supp. 3d 767, 775 (E.D. Pa. 2022) (citation omitted).

## III. DISCUSSION

As an initial matter, "the Supreme Court established a 'bright-line rule that any technical violation of a traffic code legitimizes a stop[.]'" *Id.* (quoting *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006)); *see also Whren v. United States*, 517 U.S. 806, 816–18 (1996). In this case, the officers stopped the vehicle in which Defendant was a passenger due to a broken headlamp and excessive tinting, in violation of the Pennsylvania Motor Code Sections 4303(a) and 4524(e). 75 Pa. C.S. §§ 4303(a), 4524(e). It is undisputed, therefore, that the officers were permitted to stop the vehicle based on the technical violations of Pennsylvania's traffic code. *See, e.g.*, *Mosley*, 454 F.3d at 252; *United States v. Garner*, 961 F.3d 264, 269 (3d Cir. 2020); *Augustus*, 590 F. Supp. 3d at 775; *United States v. Holloway*, No. CR 21-471, 2023 WL 6927328, at *3 (E.D. Pa. Oct. 18, 2023). Once the police have properly stopped a vehicle, the officers are permitted to order the passengers out of the vehicle while the stop is being conducted. *See Pennsylvania v. Mimms*, 434 U.S 106, 110–11 (1977); *Augustus*, 590 F. Supp. 3d at 777 (citing *United States v. Yamba*, 407 F. Supp. 2d. 703, 708 (W.D. Pa. 2006), *aff'd* 506 F.3d 251 (3d Cir. 2007)); *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004).

The Supreme Court and Third Circuit have also made clear that officers need not ignore plainly identifiable contraband discovered during a *Terry* frisk, even though the contraband may not have been the firearm for which the officers were expressly searching. *See Michigan v. Long*,

463 U.S. 1032, 1050 (1983) ("If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances." (collecting cases)); *see also United States v. Davis*, 726 F.3d 434, 440 (3d Cir. 2013) ("During the search, they found something else—cocaine in the backseat—but they 'clearly cannot be required to ignore the contraband' discovered 'while conducting a legitimate *Terry* search'" (quoting *Long*, 463 U.S. at 1050)); *United States v. Carrion*, No. 22-3357, 2024 WL 1281132, at *3 (3d Cir. Mar. 26, 2024) (holding that the officer "had good reason to suspect that Carrion was armed and dangerous . . . [s]o she could lawfully search the passenger area . . . for weapons—and seize any contraband incidentally discovered during that search."); *United States v. Yamba*, 506 F.3d 251, 259 (3d Cir. 2007) ("That is, a *Terry* search cannot purposely be used to discover contraband, but it is permissible that contraband be confiscated if spontaneously discovered during a properly executed *Terry* search.").

Therefore, the key question before the Court, and what the Motion turns on then, is whether officers properly conducted a warrantless search of the vehicle once Defendant and Mr. Palmer were detained in the back of a police vehicle. ECF No. 54 at 9–12. Indeed, one of the "specifically established and well-delineated exceptions" to the Fourth Amendment's warrant requirement is a "stop and frisk" established by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). *Holloway*, 2023 WL 6927328, at *3. Under *Terry* and its progeny case *Michigan v. Long*, 463 U.S. 1032, 1051 (1983), officers may without a warrant conduct a protective search of a vehicle's passenger compartment if the officers can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant intrusion." *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) (citation omitted). To warrant intrusion, the officers must "believ[e]

that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long*, 463 U.S. at 1049. Therefore, officers may conduct a *Terry* frisk of a vehicle "passenger compartment to uncover weapons, as long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Id.* at 1051.

The Government argues that three factors considered in their totality rise to the level of justifying the officers' reasonable suspicion that Defendant possessed a firearm. ECF No. 58 at 8–11. First, the Government outlines that the stop took place in a high-crime district. *Id.* at 11. Second, the Government alleges that the vehicle failed to comply with the activated police lights and sirens because "the vehicle did not immediately pull over" and stop. *Id.* Third, the Government highlights that, during the vehicle's "slow roll," officers saw Defendant reach under his seat and throw an object into the backseat. *Id.* Taken together, the Government argues that the officers had the requisite reasonable suspicion to conduct a *Terry* frisk of the vehicle. *Id.* at 11–12. In moving to suppress, Defendant argues that the officers "lacked the requisite reasonable suspicion to believe that Mr. Anderson was armed and dangerous." ECF No. 54 at 10. Defendant further argues that, even if the officers reasonably suspected that Defendant was armed, "the circumstances at the time of the search foreclosed any legitimate protective search justification" because Defendant was handcuffed and in the back of the police vehicle. *Id.* at 11.

The Court finds that Officers Kusowski and Ramuno had the requisite reasonable suspicion to frisk the passenger compartment of the vehicle during the traffic stop. "As the 'reasonable suspicion' inquiry is highly fact-dependent in nature," the Court carefully considers the facts presented in briefing, the testimony heard at the November 17, 2026 hearing on the Motion, and the credibility of the officers' testimony. *United States v. Goodrich*, 450 F.3d 552, 553 (3d Cir. 2006). The Court "look[s] to 'the totality of the circumstances, the whole picture' in deciding

whether there was reasonable suspicion." *United States v. Baley*, 505 F. Supp. 3d 481, 490 (E.D. Pa. 2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "The 'totality of the circumstances includes an officer's knowledge, experience, and common sense judgments about human behavior.'" *Id.* (quoting *Robertson*, 305 F.3d at 167).

Indeed, the stop occurred in a high-crime area. Hr'g Tr. at 8:22–9:1, 53:19–20. Officer Ramuno testified that he associated the location of the stop as a location where violent crimes occurred, and he recounted a violent encounter in the exact spot as the traffic stop. *Id.* at 55:12–18. The officers also testified that they have made hundreds of firearm arrests in the 25th Police District. *Id.* at 10:10–23, 53:24–54:12. Yet, the fact that the stop occurred in a high-crime area "is not alone sufficient to find reasonable suspicion." *Baley*, 505 F. Supp. 3d at 492 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). However, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.* (quoting *Wardlow*, 528 U.S. at 124). Therefore, while this alone is insufficient to justify a *Terry* frisk, the Court may consider the stop's location "among the relevant contextual considerations in a *Terry* analysis." *Id.* (first quoting *Wardlow*, 528 U.S. at 124; then citing *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) (finding a traffic stop's location in a high-crime area to be relevant for the Court's reasonable suspicion *Terry* frisk analysis)).

Furthermore, the officers' suspicion that Defendant possessed a firearm was largely informed by the vehicle failing to stop once the police sirens and lights were activated. Hr'g Tr. 14:2–11. During this time, the officers observed Defendant reaching underneath his seat and throwing a box or other rectangular shaped object into the back of the vehicle. *Id.* at 14:24–15:9 ("I can see the Defendant take something. He goes under his seat . . . He reaches under his seat,

and he throws a dark rectangular object into the back seat over his left shoulder."), 57:7–14 ("He was fumbling around at the floorboard in front of him, and then he threw a box in the backseat . . . which kind of raised concerns for myself, thinking that, you know, is this guy reaching for a gun? And that's basically what I was thinking right away. Like, this guy's grabbing a gun or hiding a gun."). The officers testified that this behavior immediately made them suspicious that Defendant was attempting to hide or retrieve a gun, based on their experience as police officers. *See id.*; *see also id.* at 15:18–16:10 ("I was afraid he was armed . . . That slow roll, in my experience . . . someone's taking that time. They want to give [themselves] time to either conceal or retrieve a weapon from that vehicle."). These articulable facts, when considered together, justify the officers' suspicion that Defendant was armed. *See United States v. Canada*, 76 F.4th 1304, 1308–09 (10th Cir. 2023) ("The furtive movement and slow roll together amount to 'something more than an inchoate and unparticularized suspicion or hunch.'" (citation omitted)). Indeed, in examining a nearly identical fact pattern, the Tenth Circuit found that the officers were justified in conducting their vehicle frisk. *Id.* In addition, when confronted with similar facts in *Moorefield*, the Third Circuit held that a defendant's behavior, including furtive hand movements and disobedience of officers' orders, "was consistent with the behavior of a person trying to conceal something." 111 F.3d at 14. Here, as in *Moorefield*, Defendant's "furtive hand movements" after the officers activated their lights and sirens, and the overall "refusal to obey the officers' orders" to pull the vehicle over immediately likewise "constituted suspicious behavior." *Id.*

The body camera footage, as well as the officers' testimony, remains consistent as to this point: based on their experience with firearms offenses, the officers believed that Defendant was either concealing or reaching for a firearm within the vehicle. Hr'g Tr. at 14:24–16:2 ("But when you're failing to stop like that, then I'm immediately becoming concerned that you may be

armed.”), 16:6–19 (“I wanted help because, again, I was—I was afraid he was armed.”), 18:12–16 (“I was afraid he was either retrieving or concealing a firearm from underneath his seat.”), 62:18–22 (“Again, from my experience, I’ve made a lot of arrests for firearms in this specific area. And my concern was that this guy was reaching for a gun.”); *see also* Ex. A at 20:20:22, 20:22:10, 20:23:15. This belief was informed by viewing Defendant reaching and throwing a rectangular object within the vehicle while simultaneously failing to immediately stop. *Id.* The officers reasoned that the driver of the vehicle “slow rolled” in order to give Defendant time to reach for or conceal his firearm. Hr’g Tr. at 14:24–16:2, 62:18–22. Their reasonable belief is further supported by the fact that they immediately called for back-up and waited for back-up to arrive and block the vehicle before approaching, as they expected that the traffic stop might escalate. *Id.* at 15:7–9, 21:25–22:4; *see also* Ex. A at 20:20:32.

Furthermore, the officers were justified in searching the shoe box in particular as part of the *Terry* frisk. Under *Terry* and its progeny case *Michigan v. Long*, 463 U.S. 1032, 1051 (1983), officers may without a warrant conduct a protective search of a vehicle’s passenger compartment if the officers can “point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant intrusion.” *Moorefield*, 111 F.3d at 12 (citation omitted). Indeed, both officers identified that the shoe box was the object that Defendant threw onto the back seat after the officers had activated their lights and sirens during the vehicle’s “slow roll.” Hr’g Tr. at 14:24–15:9, 17:13–18:16, 57:7–14. The officers also identified that this would be a typical spot where they would expect someone to conceal a firearm. *Id.* at 54:13–17. Moreover, both officers were further justified in searching through the shoe box to ensure that a firearm was not hidden at the bottom because the box was full of envelopes and the officers believed that a gun might be hidden under the papers. *Id.* at 66:23–67:2, 75:16–24. In completing

this search, the officers' reasonable suspicion rose to the level of probable cause that Defendant was committing a crime. *See Long*, 463 U.S. at 1050–52. Indeed, the officers immediately noticed that the checks appeared to be fraudulent. Hr'g Tr. at 32:5–24, 66:25–67:2. Their determination was based on seeing different names on each of the checks and observing that the envelopes were opened in a peculiar way to reveal the amount of each check. *Id.* at 32:5–24, 33:3–6, 33:16–24, 66:25–67:2. If the officers had ignored the plainly fraudulent checks, they would have been derelict in their duties as law enforcement officers. *See Long*, 463 U.S. at 1050; *see also Davis*, 726 F.3d at 440.

Therefore, based on the totality of the circumstances, Officers Kusowski and Ramuno had reasonable suspicion that Defendant was armed and dangerous. Hr'g Tr. at 14:24–16:2, 16:6–19, 18:12–16, 62:18–22. Under *Terry* and its progeny, the officers "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Moorefield*, 111 F.3d at 14 (quoting *Terry*, 392 U.S. at 27). Overall, a combination of the following facts all gave rise to the officers' reasonable suspicion that Defendant was dangerous and armed: (1) Defendant's actions of reaching under his seat and throwing a box into the rear of the vehicle; (2) the vehicle's "slow roll" before stopping; and (3) the high-crime area where the stop occurred. As held by the Third Circuit when dealing with similar facts in *Moorefield*, the circumstances of this stop "embod[y] the kind of specific, articulable facts that *Terry* contemplates." *Id.* Therefore, the *Terry* frisk of the vehicle was justified, and the Motion to Suppress is denied.

## IV. **CONCLUSIONS OF LAW**

1. Officers Kusowski and Ramuno had a reasonable suspicion that Defendant was armed once they observed (1) Defendant reaching and throwing an object within the vehicle,

(2) following the officers' activation of their lights and sirens, (3) while the vehicle was slow rolling, (4) in a high crime area.

2. The officers' reasonable suspicion permitted their search of the passenger compartment of the Sonata for a firearm under *Terry* and its progeny.

3. The officers were not required to disregard the plainly fraudulent checks that they discovered upon their search for a firearm.

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 54) is **DENIED**. An appropriate Order will follow.

**BY THE COURT:**

**/s/ Chad F. Kenney**

**CHAD F. KENNEY, JUDGE**